J-E01013-20

2020 PA Super 200

| | | |
|---|---|---|
| IN THE INT. OF: K.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.W.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1537 MDA 2019 |

Appeal from the Decree Entered August 23, 2019
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s): 13-AD-2019 and CP-22-DP-98-2016


BEFORE: PANELLA, P.J., STABILE, J., DUBOW, J., KUNSELMAN, J., NICHOLS, J., MURRAY, J., McLAUGHLIN, J., KING, J., and McCAFFERY, J.

OPINION BY DUBOW, J.:                    **FILED AUGUST 18, 2020**

Appellant, K.W.R. ("Mother"), appeals from the August 23, 2019 Decree that both involuntarily terminated her parental rights to K.M.W. ("Child") and changed Child's permanency goal to Adoption. This Court certified this case for *en banc* review to determine whether this Court should quash this appeal pursuant to **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), and **Matter of M.P.**, 204 A.3d 976 (Pa. Super. 2019), because Mother filed a single Notice of Appeal from a Decree listing more than one lower court docket number. Because the trial court misinformed Mother to file a single notice of appeal from multiple lower court dockets, we decline to quash this appeal. Upon review of the merits, we affirm.

## I.    MOTHER'S NOTICE OF APPEAL

On October 9, 2019, Mother filed a timely single Notice of Appeal from a Decree that both terminated her parental rights on the adoption docket and changed Child's permanency goal to Adoption on the dependency docket. Mother listed both lower court docket numbers on the single Notice of Appeal (Docket Nos. 13 AD 2019 and CP-22-DP-98-2016). We granted *en banc* review to determine whether this Court should quash this appeal pursuant to ***Walker***, ***supra***, and ***M.P.***, ***supra***.[1] Per Curium Order, 4/6/20.

In June 2018, our Supreme Court disapproved of the common practice of filing a single notice of appeal from an order or judgment involving more than one docket number. **See generally *Walker*, *supra*.** The Court observed that "the proper practice under [Pa.R.A.P.] 341(a) is to file separate appeals from an order that resolves issues arising on more than one docket." ***Walker***, 185 A.3d at 977. Accordingly, the Court determined, "[t]he failure to do so requires the appellate court to quash the appeal." Similarly, in ***M.P.***, in an appeal from a termination of parental rights, this Court held that ***Walker*** compels quashal when an appellant files a single notice of appeal from both a dependency and an adoption lower court docket. 204 A.3d at 981.

During the pendency of the instant appeal, an *en banc* panel of this Court clarified the holding in ***Walker*** and concluded, "the bright-line rule set

---

[1] This Court issued a Rule to Show Cause why Mother's appeal should not be quashed pursuant to ***Walker***. Mother filed a Response, and this Court discharged the Rule and referred the ***Walker*** issue to the merits panel, which subsequently quashed the appeal. Mother filed an Application for Reargument, which this Court granted, thus certifying this case for *en banc* review.

forth in **Walker** only required an appellant to file a '**separate**' notice of appeal for each lower court docket the appellant was challenging" and this court "should not invalidate an otherwise timely appeal based on the inclusion of multiple docket numbers" because neither **Walker** nor Rule 341 expressly forbid this practice. **Commonwealth v. Johnson**, ___ A.3d ___, 2020 WL 3869723, at * 4 (Pa. Super. 2020) (*en banc*).

However, there are exceptions to the bright-line rule set forth in **Walker**. This Court has declined to quash a defective notice of appeal when the defect resulted from an appellant's acting in accordance with misinformation from the trial court, deeming the situation a breakdown in court operations. **See Commonwealth v. Larkin**, ___ A.3d___, 2020 WL 3869710 at *3 (Pa. Super. 2020) (*en banc*)*; **Commonwealth v. Stansbury**, 219 A.3d 157 (Pa. Super. 2019). In **Larkin**, an appellant filed a *pro se* notice of appeal seeking relief relating to more than one docket after the order informing appellant of his appellate rights provided "Petitioner has thirty (30) days from the date of this order to file **an** appeal." ___ A.3d at __, __, 2020 WL 3869710 at *3 (emphasis in original). An *en banc* panel of this Court held that this Court may "overlook the requirements of **Walker** where . . . a breakdown occurs in the court system, and a defendant is misinformed or misled regarding his appellate rights." **Larkin, supra** at *3. Similarly, in **Stansbury**, the lower court advised the appellant that he could pursue appellate review by filing "**a** written notice of appeal[,]" despite the fact that **Walker** compelled the filing of separate notices of appeal at each docket

- 3 -

number. 219 A.3d at 159 (emphasis in original). This Court declined to quash the appeal, concluding that a breakdown in court operations occurred. *Id.* at 160.

In her Brief, Mother avers that her appeal should not be quashed for a defect in the Notice of Appeal, asserting that (1) her sole intent was to appeal the Decree on the adoption docket; (2) she included both docket numbers on the Notice of Appeal in order to mirror the trial court's caption; and (3) no party suffered prejudice. Mother's Br. at 41-42. Mother further argues that this Court should grant her Application to Strike Trial Court Docket Number in which she requested this Court to strike the dependency docket number to cure her defective Notice of Appeal. *Id*. at 44.

Although Mother avers that she had the sole intent to appeal the Decree on the adoption docket, that contention is not supported by the issues raised in her Brief. In her Brief, Mother raises an issue that pertains to Child's goal change on the dependency docket: "Were adequate reunification services provided by the Agency prior to filing the petition to terminate Mother's parental rights?" *Id.* at 4. In addition, Mother argues that the Agency did not offer adequate services to promote the Reunification goal and cites sections of, *inter alia*, the Juvenile Act, which governs dependency proceedings. *See id.* at 27-34 (citing 23 Pa.C.S. § 2511(a)(5), 42 Pa.C.S. § 6301, *et seq.*). Thus, we reject Mother's contention that she solely intended to challenge the adoption docket.

Nevertheless, we are persuaded by Mother's argument that she included both docket numbers on the Notice of Appeal to mirror the trial court's caption in the Decree terminating Mother's parental rights. Our review of the record reveals that the Decree included both the adoption docket number and the dependency docket number and, most notably, informed Mother, "[t]his order shall become absolute as of course if **no appeal** is taken, within thirty (30) days, pursuant to Pa.R.A.P. 341." Decree, 8/21/19 (emphasis added). The trial court's indication that Mother could seek relief from this Court by filing a singular appeal from multiple lower court docket numbers constitutes a breakdown in court operations. Accordingly, we decline to quash this appeal.

Mother also avers that this Court should decline to quash because no party suffered prejudice because of her defective Notice of Appeal. We acknowledge that this is a children's fast track case, often subject to unique rules and procedures. Indeed, as Mother argues, in a children's fast track case this Court has declined to quash a defective notice of appeal resulting from noncompliance with the Rules of Appellate Procedure when no party has suffered prejudice. Mother's Br. at 45 (citing *In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009)). However, in *K.T.E.L.*, the appellant failed to comply with Rules 905(a)(2) and 1925(a)(2), which require an appellant to file a concise statement contemporaneously with the notice of appeal. 983 A.2d at 747; Pa.R.A.P. 905(a)(2), 1925(a)(2). As discussed above, *Walker* compels quashal for failure to comply with Rule 341, which requires an appellant to file separate notices of appeal from an order that resolves issues arising on more

than one docket. ***Walker, supra*** at 977. ***Walker*** declined to provide an exception for children's fast track cases, and we are constrained by this holding.[2] ***See generally id***.

Finally, in light of our disposition, we deny Mother's Application to Strike as moot. Because we decline to quash this appeal due to a breakdown in court operations, there is no reason to strike the dependency docket number to cure the defect in the Notice of Appeal. Moreover, because Mother raises an issue that arguably challenges Child's goal change to Adoption on the dependency docket, simply removing the docket number from the Notice of Appeal would not, in fact, cure the defect. On the contrary, this Court has recently concluded that the bright-line rule set forth in ***Walker*** does not forbid the inclusion of multiple docket numbers on a notice of appeal, but rather requires an appellant to file a separate notice of appeal for each lower court docket the appellant is challenging. ***Johnson***, ___ A.3d at ___, 2020 WL 3869723, at *4.

_____

[2] If Mother files a petition for allowance of appeal following our disposition in this case, we request that the Supreme Court grant allocatur in order to determine whether ***Walker*** should apply in a children's fast track case. As discussed, the Superior Court has already held that in a children's fast track case, we should overlook a technical defect in a Notice of Appeal and avoid the "extreme action of dismissal" when the defect does not prejudice any party. ***K.T.E.L.***, 983 A.2d at 747 (citation omitted). We believe that this principle should also apply to a Notice of Appeal that violates the technical requirements set forth in ***Walker*** and Rule 341 when the technical violation does not prejudice parties, and does not hamper our ability to review the appeal. We, however, lack the authority to create this children's fast track exception to ***Walker*** and request that the Supreme Court consider doing so.

For the reasons stated above, we decline to quash Mother's appeal.

## II.  TERMINATION OF MOTHER'S PARENTAL RIGHTS AND PERMANENCY GOAL CHANGE TO ADOPTION

Having declined to quash Mother's appeal for a defective Notice of Appeal, we now address the merits of Mother's challenge to the termination of her parental rights and her contention that Dauphin County Social Services for Children and Youth ("Agency") failed to provide adequate reunification services.

**FACTUAL AND PROCEDURAL HISTORY**

The trial court provided a through and accurate factual and procedural history, which we adopt for purposes of this appeal.  **See** Trial Ct. Op., filed 11/19/19, at 1-13.  In sum, Mother and V.W., Jr. ("Father") are parents to Child, who was born in August 2015.[3]  Mother and Father have a history of substance abuse, domestic violence, and incarceration.  In March 2016, the Agency placed Child with family members after receiving a report that marijuana was found in or around then-seven-month-old Child's crib.  Mother entered a detox facility, and Father remained incarcerated for assaulting Mother.  Mother's three older children were not living with her at the time.

On April 13, 2016, the trial court adjudicated Child dependent and ordered Mother to complete the following objectives:  complete three drug screens per week as well as random drug screens; complete parenting classes;

---

[3] The trial court terminated Father's parental rights and he is not a party to this appeal.

- 7 -

and obtain mental health evaluations and complete any recommended treatment. The Agency also created objectives for Mother, which mirrored the trial court's objectives and added the following objectives: obtain a drug and alcohol evaluation and complete recommended treatment; obtain suitable housing; participate in visitation with Child; and cooperate with Agency, including attending meetings and signing releases.

On August 9, 2016, Dr. Howard S. Rosen conducted a psychological evaluation of Mother and diagnosed her as having a substance use disorder, alcohol use disorder, depressive disorder, and traits of narcissism. He made specific treatment recommendations.

Over the next two years, Mother was incarcerated multiple times because of her continued substance abuse and parole violations, and the trial court made multiple findings that Mother was minimally compliant with her objectives. Mother continued to test positive for heroin and/or cocaine and refused to submit to drug screens. Mother spent a total of 415 days incarcerated.

On April 26, 2018, the trial court changed Child's permanency goal to Subsidized Permanent Legal Custody ("SPLC").

On June 13, 2018, Mother was released from her latest period of incarceration, and she attended an August 28, 2018 dependency hearing. The trial court found Mother minimally compliant and once again ordered her to provide urine screens three times per week, as well as complete the remainder

of her objectives. After the hearing, the Agency requested that Mother provide a drug screen, and she refused.

While on parole, Mother began and completed intensive outpatient therapy, domestic violence counseling, couples counseling, and enrolled in school.

Mother submitted to monthly drug screens at the request of her parole officer but continued to refuse to submit to the court-ordered tri-weekly drug screens at the request of the Agency. Mother refused Agency-requested drug screens despite the Agency and the trial court both informing her that a refusal to submit to a drug screen is presumed to be a positive drug screen. The last date that Mother submitted to an Agency-requested drug screen was October 7, 2016. Moreover, in August 2019, during an Agency-supervised visit with Child, parents went into their home to retrieve a forgotten item and returned to the visit smelling like marijuana.

Mother continuously failed to cooperate with the Agency and accused the Agency of falsifying information. Mother also posted statements on a nationwide social media website that identified caseworkers by name, called the caseworkers liars, and claimed the Agency illegally kidnapped Child.

On February 5, 2019, the Agency filed a Petition to Involuntarily Terminate Mother's Parental Rights ("TPR Petition"). After a two day hearing, on August 21, 2019, the trial court changed Child's permanency goal to

Adoption and terminated Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b).[4]

Mother timely appealed. Mother and the trial court both complied with Pa.R.A.P. 1925.

## ISSUES RAISED ON APPEAL

Mother raises the following issues for our review:

A. Did petitioner prove statutory grounds for involuntary termination of Mother's parental rights by clear and convincing evidence?

B. Did petitioner prove by clear and convincing evidence that Mother had relinquished her parental claim, or failed/refused to perform parental duties?

C. Did petitioner prove by clear and convincing evidence that Mother failed to remedy any conditions which led to [Child] being placed in care within a reasonable time?

D. Did the Agency prove by clear and convincing evidence that [Child]'s best interests, needs and welfare are served by the termination of Mother's parental rights?

E. Did the [c]ourt give primary consideration to the developmental, physical and emotional needs, the age and welfare of [Child], the parental bond and the preservation of a sibling relationship for [Child]?

F. Were adequate reunification services provided by the Agency prior to filing the petition to terminate Mother's parental rights?

Mother's Br. at 4 (reordered for ease of disposition).

## LEGAL ANALYSIS

---

[4] The trial court appointed Mindy Goodman, Esq., as Child's legal counsel in the TPR proceedings.

When we review a decision of trial court to terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. (citation omitted). We, likewise, review an order regarding a placement goal of a dependent child under an abuse of discretion standard. *In re B.S.*, 861 A.2d 974, 976 (Pa. Super. 2004). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

In addressing petitions to terminate parental rights involuntarily, the Adoption Act requires the court to conduct a bifurcated analysis. *See* 23 Pa.C.S. § 2511(a) and (b). The court must first focus on the conduct of the parent, and, if the party seeking termination presents clear and convincing evidence that the parent's conduct meets one of the grounds for termination set forth in Section 2511(a), then the court will analyze whether termination

of parental rights will meet the needs and welfare of the child, *i.e.*, the best interests of the child, as provided in Section 2511(b). The court must examine the existence of the child's bond with the parent, if any, and the potential effect on the child of severing such bond. ***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007). A parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his parental duties, to the child's right to have proper parenting and fulfillment of the child's potential in a permanent, healthy, safe environment. ***In re B.,N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Instantly, Mother avers that the trial court abused its discretion when it terminated Mother's parental rights under multiple subsections of 23 Pa.C.S. § 2511(a) and subsection (b). Mother's Br. at 4-5. We need only agree with its decision as to any one subsection of Section 2511(a) and subsection (b) in order to affirm the termination of parental rights. ***See In re B.L.W.,*** 843 A.2d 380, 384 (Pa. Super. 2004) (citation omitted). For the following reasons, we conclude that the trial court correctly determined that the Agency met its burden of proof under 23 Pa.C.S. § 2511(a)(2) and (b).

**Termination Pursuant to 23 Pa.C.S. § 2511(a)(2)**

Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes

of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); ***In re Adoption of S.P.***, 47 A.3d 817, 827 (Pa. 2012) (citations omitted). The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. ***Id.*** At a termination hearing, the orphans' court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to co-operate with the agency or take advantage of available services during dependency proceedings. ***Id.*** at 340.

With respect to incarcerated parents, our Supreme Court has held that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence." ***In re Adoption of S.P.***, 47 A.3d 817, 830 (Pa. 2012) (citation and internal quotation marks omitted). Incarceration alone is not sufficient to support termination under any subsection, but "incarceration will certainly impact a parent's capability of performing parental duties, and **may** render a parent incapable of performing parental duties under subsection

(a)(2)." *In re E.A.P*., 944 A.2d 79, 82–83 (Pa. Super. 2008) (emphasis in original).

"Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind . . . that the child's need for consistent parental care and stability cannot be put aside or put on hold[.]" *Id*. at 84. "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *B.,N.M.*, 856 A.2d at 855 (citation omitted). Rather, "[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.* (citations omitted). Importantly, a parent's "recent efforts to straighten out [her] life" upon release from incarceration does not require that a court "indefinitely postpone adoption." *In re Z.P.*, 994 A.2d 1108, 1125 (Pa. Super. 2010) (citations omitted).

Applying these principles, the trial court concluded that Mother's repeated incarceration and continued substance abuse rendered her incapable of parenting Child and caused Child to be without essential parental care, control or subsistence for over three years. The trial court opined:

> Since September 2016, Mother has complied minimally with service objectives critical to her ability to properly parent [Child]. Most of Mother's efforts began only after the Agency sought termination. . . Mother's incarceration and re-incarceration prevented her from completing essential objectives and performing her parental duties to [Child]. . . Mother violated parole conditions by absconding or continuing drug use, thwarting

- 14 -

opportunities to progress toward reunification. Her incarceration, as a result of her own choices, created long absences from [Child]'s life. We recognize that Mother has, in the recent past, worked toward recovery and sought mental health and domestic violence counseling as well as an education. For an unreasonable period of time, Mother failed to comply with objectives which would evidence sustained progress toward achieving mental health and recovery. . . Mother made those efforts years after the recommendations in 2016. For the ensuing years, a time critical to [Child]'s development, others provided all of her needs.

Trial Ct. Op. at 17-18.

The trial court also highlighted that Mother remained non-compliant with court-ordered tri-weekly drug screens, non-cooperative with the Agency, and had not progressed past supervised visitation with Child while Child remained in placement for over 40 months. *Id*. at 6, 8, 13. Our review of the record supports the trial court's findings. We decline to usurp the trial court's credibility determinations or reweigh the evidence. Accordingly, we conclude that the trial court did not abuse its discretion when it terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2).

**Termination Pursuant to 23 Pa.C.S. § 2511(b)**

Mother also contends that the trial court abused its discretion when it determined that it was in Child's best interest to terminate Mother's parental rights pursuant to Section 2511(b). Mother's Br. at 4-5. We conclude, however, that the evidence supports this finding of the trial court.

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether "termination of parental rights would best serve the developmental,

physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted).

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. Notably, where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-3 (Pa. Super. 2008).

It is sufficient for the trial court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. *Z.P.*, 994 A.2d at 1121. The trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super.

2011). Ultimately, the concern is the needs and welfare of the child. *Z.P.*, 994 A.2d at 1121.

Mother avers that a bond exists between Mother and Child and that severing that bond would prove detrimental to Child. Mother's Br. at 37, 40. Mother argues that her own testimony about how she feels about Child, as well as the testimony of case aide Uniqua Lewis, who described the "emotional ties" between Mother and Child, both demonstrate that Mother and Child are bonded. *Id.* at 40.

However, the trial court credited Dr. Rosen's testimony that the timing and duration of Child's separation from Mother occurred during a period critical to the development of a strong bond and weekly supervised visitation upon Mother's release from prison was "hugely insufficient" to form a parent-child bond. Trial Ct. Op. at 10-11 (citing N.T., 8/21/19, at 41, 47-48, 62). The trial court also highlighted the testimony of caseworker Betsy Jo Harr, who observed that Child views Mother as more of a "fun aunt" than a mother figure. *Id*. at 13. Moreover, the trial court was unpersuaded that Child's "hugs and kisses at visits with [p]arents, or her crying at the end of visits, demonstrate the existence of a bond which, if broken, will cause detriment to [Child]." *Id.* at 20. The trial court opined:

> We found compelling in Dr. Rosen's testimony that [Mother]'s absence from [Child]'s day to day life during a critical developmental period rendered formation of a bond with parents essentially impossible. Rather, the evidence demonstrates the existence of a healthy bond between [Child] and her long-term foster parents. [Child] views her foster parents as Mom and Dad

and looks to them to provide all of her essential physical and emotional care. We see potential harm to [Child] if she were removed from her stable and loving foster family, with whom she has formed her primary attachment, only to be placed with [Mother] who [has] failed to demonstrate the ability to provide stability for [Child].

Trial Ct. Op. at 21.

Based on these factors, the trial court concluded that terminating Mother's parental rights would best serve Child's "developmental, physical and emotional needs and welfare." *Id*. at 19.

Our review of the record supports the factual findings of the trial court and, once again, we decline to reweigh the evidence. The evidence supports the trial court's conclusion that terminating Mother's parental rights is in Child's best interest. Accordingly, we find no abuse of discretion.

**Reunification Services**

Finally, Mother contends that the Agency did not provide adequate reunification services to promote Child's goal of Reunification prior to filing a TPR Petition. Mother's Br. at 27, 30. Mother argues that at both the February 25, 2019 permanency review hearing and the goal change/termination hearing, the Agency failed to present evidence "as to any additional services or assistance provided beyond making referrals or observing visits." *Id.* at 30. This argument is devoid of merit.

An agency is not required to provide reunification services when a child's permanency goal is changed from Reunification. *T.S.M*., 71 A.3d at 261 n.22. "As a practical and legal matter, an order by the juvenile court changing the

- 18 -

child's placement goal from reunification [] ends any dispute that may exist between [the Agency] and the parent as to the adequacy of the [Agency's] services aimed at reuniting." ***In re Interest of M.B.***, 388 565 A.2d 804, 807–08 (Pa. Super. 1989).

The trial court changed Child's permanency goal from Reunification to SPLC at the April 26, 2018 permanency review hearing. Accordingly, from that date on, the Agency was not required to provide reunification services to Mother and Child. Thus, Mother's argument lacks merit.

### III. CONCLUSION

In sum, for the reasons stated above, because the trial court misinformed Mother to file a single notice of appeal from multiple lower court dockets, which constitutes a breakdown in court operations, we decline to quash this appeal. In addition, our review of the record reveals that the trial court properly found that the Agency provided clear and convincing evidence to support the termination of Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(2) and (b) and to change Child's permanency goal to Adoption.

Decree affirmed. Application to Strike denied.

President Judge Panella, and Judges Stabile, Kunselman, Nichols, McLaughlin, King, and McCaffrey join the Opinion.

Judge Murray files a concurring statement.

- 19 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>08/18/2020</u>